PETER C. LAGARIAS (SB NO 77091)
pcl@lb-attorneys.com
ROBERT S. BOULTER (SB NO. 153549)
rsb@lb-attorneys.com
LAGARIAS & BOULTER, LLP
1629 Fifth Avenue
San Rafael, California 94901-1828
Telephone: (415) 460-0100
Facsimile: (415) 460-1099

L. MICHAEL HANKES (Pro Hac Vice)
mh@hankeslaw.com
63 Commercial Wharf
Boston, MA 02110
Telephone: (617) 723-1144
Facsimile: (617) 723-0304

JONATHAN WEISS (SBN 143895)
jw@lojw.com
LAW OFFICE OF JONATHAN WEISS
10576 Troon Avenue
Los Angeles, CA 90064-4436
Telephone: (310) 558-0404
Facsimile: (310) 558-0100

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| Samica Enterprises, LLC, an Illinois limited liability company; et al.<br><br>Plaintiffs,<br><br>v.<br><br>MAIL BOXES ETC. USA, INC., a California corporation; MAIL BOXES ETC., a California corporation; et al.<br><br>Defendants. | Case No.: CV 06-2800 ODW (CT)<br><br>Hon. Otis D. Wright, II<br><br>DECLARATION OF PLAINTIFF JOHN ROUSSEAU IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>Date: July 27, 2009<br><br>Time: 1:30 p.m. |

I, John Rousseau, hereby state and declare:

1. I am a plaintiff in this action.

2. I converted my MBE Franchise Store(s) Number 112 to The UPS Store in 2003, and I have personal knowledge of the facts and information set forth herein and if called as a witness herein would testify as set forth herein.

3. At the time I converted my above franchise, I and the corporation I formed, Boardwalk Communications, Inc., were residents of the State of Michigan. As specified in the franchise agreement I signed with MBE and UPS, at all times the franchise we operated was located at Waterford, Michigan.

4. In early 2003, I was informed that Gold Shield testing for new pricing and branding concepts that would be important to our profitability had been completed and that new lower pricing using The UPS Store brand had led to the highest results in the testing. I was informed that a roadshow describing the Gold Shield results and amendments to our franchise agreements that would be necessary would occur later in 2003. I was also told that we would be the premier retail channel for UPS.

<u>Gold Shield Roadshow Representations</u>

5. In early 2003, I attended a Gold Shield roadshow in my region with many other MBE franchisees. The meeting occurred on February 23, 2003 at the Holiday Inn in Livonia, Michigan. I was required to sign a confidentiality agreement and was provided with the Gold Shield amendments and other

documents. At the roadshow, UPS and MBE executives and representatives Sean Blickley, Kurt Schusterman, Bob Mundt, Sr., Bob Mundt, Jr., and others were present. These MBE/UPS executives and representatives made presentations recommending that I sign the Gold Shield amendments. They stated that the Gold Shield testing established that The UPS Store test centers had the highest gross profits and profit opportunity. Part of the presentation included a power point show with graphs and numeric charts showing the alleged results of the tests, profitability numbers, and other conclusions.

6. MBE/UPS told me that I would be required to charge no more than the maximum retail rates for UPS shipping to my customers, and that MBE would use its best efforts to obtain incentives and discounts for me. MBE/UPS also told me that I was the Premier Retail Channel for UPS, and that my interests as well as customers and UPS were of concern to them. As a result of these statements and documents provided to me, I reasonably expected that I would receive incentives and discounts below wholesale so that I could make adequate profitable margins as shipping was the major revenue source for my businesses.

<u>Reliance on Gold Shield Representations</u>

7. I believed and relied upon the information provided in the roadshow presentations and documents and trusted that what I saw, read and heard was truthful and accurate. In addition, I had no knowledge regarding the testing, the test data or the test conclusions. I trusted MBE and UPS, because they had been in this business for many years and said they knew the business well. I also believed that MBE and UPS had competent personnel and had conducted fair and adequate tests and truthfully reported the results. I also believed that UPS was allowing me to use their name in my business and that UPS would be helpful, not

hurtful to my business.

8. Another reason I relied on the roadshow information is because MBE and UPS told me that the current business model for MBE was broken, and that this new program was the solution. I also relied on other oral and written information provided at the Gold Shield roadshow including but not limited to the following:

a) The PowerPoint Presentation;

b) The Frequently Asked Questions;

c) The Summary of the Gold Shield Program;

d) MBE/UPS' representatives told me that based upon the Gold Shield test data and results that UPS' name recognition behind The UPS Store would drive all profit centers higher and my profits would go up 40% in the first year;

e) Tim Wagner, a store owner from Washington State, who was in one of the test programs and was one of the presenters offered by MBE/UPS, told me that based on the test data and results, I would be profitable under the Gold Shield program; and,

f) MBE/UPS told us that they would no longer sell new Mail Boxes, Etc. franchises or renewals of existing Mail Boxes, Etc. stores under the Mail Boxes, Etc. brand.

## Material Omissions

9. I was not informed during the Gold Shield roadshow or at any other time before I signed the Gold Shield amendments that some of the franchisees had concluded prior to the roadshows that upselling air services with higher profit margins could not occur and was unethical. I was not told this. Since signing the Gold Shield amendments I have learned, from personal experience,

that upselling to air services is not practical because UPS delivers ground shipments virtually as fast as air in many areas of the country. Not only has the opportunity to upsell to air services declined since the Gold Shield rollout, but I cannot ethically sell air service to customers who need anything less than next day delivery. This was a material fact which should have been disclosed to us. In addition, no new Uniform Franchise Offering Circular was provided to us as part of the Gold Shield conversion process.

10. I was not informed during the Gold Shield roadshow that no study had been done on the impact of changed gross profits of drop-offs and drop boxes taking away revenue from a franchise territory. This was material and should have been studied and disclosed to us, as MBE and UPS were asking us to agree to lowered margins based on higher sales volumes. I later obtained a copy of a November 27, 2002 FAC memorandum raising serious questions about the Gold Shield program that MBE/UPS did not disclose to us. If I had known about all of these undisclosed material facts, which MBE/UPS did not tell me, I would not have signed the Gold Shield papers and converted my Mail Boxes Etc. store(s) to the UPS Store franchise(s). Other reasons I would not have converted my Mail Boxes Etc. store(s) to the UPS Store if full disclosures had been made to me include, but are not limited to:

a) I did not know that UPS would be my biggest competitor;

b) I did not know that the Gold Shield Model would reduce my non-shipping profit;

c) I did not know that UPS would try to convert some of my house account shipping customers to their own customers;

d) I did not know that UPS would make it easier to ship from home and drop packages at a UPS Store, and would promote how easy it is to print your own label and drop it off at a The UPS Store;

e) I did not know that my margins on paid packages and my net profit would decrease despite an increase in packages shipped;

f) I did not know that UPS would not assist us to build our business, which would also increase their shipping volume. Instead, UPS went into direct competition with us and convinced our best customers to ship through a UPS Six Digit Account. Now we get a few dollars for drop-offs instead of hundreds of dollars for processing and shipping those packages;

g) I did not know that UPS had confused the brand by naming it the UPS Store, causing significant confusion of the public and conflict in my store;

h) I did not know that MBE/UPS would demand that we take in an ever-increasing number of drop off packages, discount all of our profit centers and try to become a copy center rather than a shipping business; and,

i) I did not know that drop offs would be a constantly increasing burden, steadily eroding my paid customer base. The people dropping off packages also expected and demanded free services and supplies for which my paying customers were responsible, and often became irate when they learned that those services and supplies were not free.

Unfair Competition by UPS

11. After the roadshows we received written notice that the Franchisee Advisory Council, or FAC, had approved of the Gold Shield amendments. We were not informed prior to signing the Gold Shield amendments that FAC had originally not approved of Gold Shield without further testing. This was material and would have affected my decision to enter the Gold Shield amendments.

12. After I entered into the Gold Shield amendments, I engaged in substantial local marketing efforts and provided the best customer service to our

clientele. My franchise business, however, became less profitable, because UPS became my biggest competitor in my territory. I also later learned that more and more shipping would be done by UPS through drop-offs, and we would get a greatly reduced payment if the shipping originated through UPS' website instead of at our store. Also I learned that if the UPS customer took the item to a UPS Authorized Shipping Outlet (ASO) or drop box near my store I would get nothing. I became aware that many of my former customers, who I had obtained through local marketing and our superior customer service, had become UPS accounts for which I would receive much less as drop-offs or nothing at all if they used UPS ASO's or drop boxes. No one told me that I would be funding and paying all the overhead for an air conditioned brick and mortar drop box that UPS would take advantage of for its own benefit. UPS took away some of my best customers, offered shipping services in my territory for substantially less than the retail rate and interfered with my local marketing. These material facts should have been disclosed to me in the roadshows, but instead we were falsely told that we would be the premier retail outlet of UPS. If I had known about these undisclosed material facts, I would not have converted my Mail Boxes Etc. store(s) to The UPS Store franchise(s). Other reasons I would not have converted my Mail Boxes Etc. store(s) to the UPS Store if full disclosures had been made to me include, but are not limited to:

a) I did not know that UPS would offer lower shipping rates to my current customers and competitors;

b) I did not know that UPS would actively work on converting my customers to their own customers;

c) I did not know that UPS would offer shipping services to my customers at retail rates that were lower than the price UPS charged me for shipping services; and,

d) I did not know that MBE/UPS would breach their contracts with me whenever they thought it was to their advantage for them to do so, no matter what the impact was on us.

UPS/MBE Fail to Use Best Efforts

13. Our documents said that in return for agreeing to fix our prices where UPS wanted them, MBE would use its best efforts to ensure that UPS would provide as with discounts and incentives that would reduce the wholesale cost to us of the UPS shipping services that we sell to our customers. Best efforts to me doesn't mean a one time deal. Best efforts means that it is a constant thing, that it is an effort that you keep going with, especially after you know there's a problem. We never saw any results from the "best efforts" that we were told would be made on our behalf, and which we believed and relied upon in entering into our Gold Shield amendments with MBE and UPS. There were no disclaimers of profitability in the Gold Shield papers that I signed. In fact, we were told at the roadshow that we would be more profitable under the new Gold Shield program. I never understood that UPS would not consider whether I could make a profit or not when setting its incentive levels to me and the prices that I could charge. I never understood that MBE would not attempt to get UPS to increase our prices, incentives, and margins in order to allow us to have a profitable business. I also never understood that UPS had no intention of meeting its obligations to set our prices reasonably, give us better incentives and discounts or to help us achieve profitable margins, even if MBE had attempted to get UPS to do so. If I had understood these things, I would not have entered into the agreement. Therefore, I believe I entered into this agreement under a vastly mistaken understanding.

## Drop Offs, Lost Profits and Damages

14. After I began operating under the Gold Shield amendments, I became aware that upselling was not possible in most instances. I also became aware that the new margins of UPS were not sufficient for my business to be profitable. Also, as not disclosed in the roadshows, my business became inundated with drop-offs. We were paid only a small part of our prior margins for drop-offs, and many of the drop-off customers had previously been my customers.

15. After I entered the Gold Shield amendments in reliance on the above Roadshow and other representations by MBE and UPS, I paid MBE royalties and other fees on a periodic basis, and I paid UPS for shipping on a periodic basis.

16. As I operated my business following Gold Shield amendments, due to the UPS competition and UPS controlled rates, I lost money. I worked diligently at local marketing, but I could not compete with UPS as it had many more employees and was offering shipping at substantially reduced rates than the retail rate we were to charge to make even small margins. I and other franchisees raised this issue to MBE at local meetings, and we asked our FAC representative to raise the margins and UPS competition issues. Although this was done repeatedly, our margins were not changed other than in small amounts on a couple of occasions.

17. I had invested much of my life savings in my The UPS Store business. Following the conversion, my profitability declined and has never recovered. My store has also declined in value and the poor performance of UPS Stores has made it impossible for me to sell it as there is no market. I have lost substantial monies and other opportunities.

## Attorneys Eyes Only Evidence

18. I am aware that my lawyers have obtained many documents and

deposition testimony, but that I cannot see the same because it has been marked confidential Attorneys' only. Thus I cannot cite to such evidence in this declaration as I have not seen it.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on 6/25/09 at Waterford. Michigan COUNTY OF OAKLAND

______________________________